UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

OLGA CASTILLO,                                    **17-CV-4597 (NG) (LB)**

                                                  **AMENDED COMPLAINT**

                               Plaintiff,

        -against-                                 **JURY TRIAL DEMANDED**

THE CITY OF NEW YORK;                             ECF Case
Detective JOSEPH DIFORTE, Tax No: 906106;
Detective MARC LEONARD, Tax No: 904353;
Sergeant ROMAN MISHIYEV, Tax No: 928791;
And Sergeant MICHAEL HAIN, Tax No: 930304;
Police Officers JOHN DOE 1 through 3,
Individually and in their official capacities (the
Name John Doe being fictitious, as the true
Names are presently unknown),

                               Defendants.

-------------------------------------------------------------------x

        Plaintiff, OLGA CASTILLO, by her attorney, LAW OFFICE OF LAURIANO

GUZMAN JR., P.C. by LAURIANO GUZMAN, JR.  hereby brings this action under 42

U.S.C § 1983 to redress her civil and legal rights, and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which the plaintiff, OLGA CASTILLO, seeks relief for

        the defendants' violations of her rights secured by the Civil Rights Act of 1871, 42

        U.S.C. 1983, by the United States Constitution, including its Fourth, Fifth and

        Fourteenth Amendments, and by the laws and Constitution of the State of New York.

        Plaintiff seeks compensatory and punitive damages, an award of costs, interest and

        attorney's fees, and such other further relief as this Court deems just and proper.

1

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C §§ 1983 and 1988, and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of the Plaintiff's constitutional and civil rights.

3.      Plaintiff further invokes the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the same case or controversy.

4.      Venue in this district is proper under 28 U.S.C § 1391 (b) and (c) in that Defendant CITY OF NEW YORK is administratively located within the Eastern District of New York, and the events giving rise to this claim occurred within the boundaries of the Eastern District of New York.

## JURY TRIAL DEMANDED

5.      Plaintiff demands a trial by jury on each and every one of her claims as pleaded herein.

## PARTIES

6.      At all times relevant to this action, Plaintiff OLGA CASTILLO was a resident of Kings County, New York.

2

7.     Defendant CITY OF NEW YORK is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY OF NEW YORK (hereinafter "CITY") assumes the risk incidental to the maintenance of a police force and the employment of police officers. Defendant CITY was at all times relevant herein the public employers of Defendants Detective JOSEPH DIFORTE, Detective MARC LEONARD, Sergeant ROMAN MISHIYEV, Sergeant MICHAEL HAIN and Police Officer JOHN DOE 1 through 3.

8.     Defendants, Detective JOSEPH DIFORTE (hereinafter "DET. DIFORTE"), Detective MARC LEONARD (hereinafter "DET. LEONARD"), Sergeant ROMAN MISHIYEV (hereinafter "SGT. MISHIYEV"), Sergeant MICHAEL HAIN (hereinafter "SGT. HAIN" and Police Officers JOHN DOE 1 through 3 are and were at all times relevant herein duly appointed and acting officers, servants, employees and agents of the New York City Police Department, a municipal agency of Defendant CITY.  At all times relevant herein, the individual defendants were acting under color of the laws, statutes, ordinances, regulations, policies, customs and/or usages of the State of New York and the New York City Police Department, in the course and scope of their duties and functions as officers, agents, servants, and employees of Defendant CITY, were acting for, and on behalf of, and with the power and authority vested in them by the CITY and the New York City Police Department, and were otherwise performing and engaging in conduct incidental to the performance of their lawful

functions in the course of their duties. They are sued individually and in their official capacity.

9.    By the conduct, acts, and omissions complained of herein, Defendants DET. DIFORTE, DET. LEONARD, SGT. MISHIYEV, SGT. HAIN and P.O. JOHN DOE 1 through 3 violated clearly established constitutional standards under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution of which a reasonable police officer under the circumstances would have known.

## NOTICE OF CLAIM

10.    Plaintiff timely filed a Notice of Claim with the Comptroller of the City of New York, setting forth the facts underlying Plaintiff's claim against Defendants NYPD DET. DIFORTE, DET. LEONARD, SGT. MISHIYEV, SGT. HAIN, and P.O. JOHN DOE 1 through 3 and Defendant CITY.

11.    The CITY assigned a claim number to Plaintiff's claim, and Plaintiff was subjected to an examination pursuant to N.Y Gen. Mun. L. Sec. 50-h on December 10, 2014.

12.    To date, no answer has been received by Plaintiff and no compensation has been offered by Defendant CITY in response to this claim.

13.    This action has been commenced within one year and ninety days of the date of occurrence of the events giving rise to this Complaint.

## STATEMENT OF FACTS

### Plaintiff's Background

14.     MS. CASTILLO, at the time of this incident, was a 49-year-old mother of two children who was born in Managua, Nicaragua. At age 12, she fled Nicaragua with her aunt because her father, a professor incarcerated by the Sandinistas, was being held as a political prisoner and they needed to escape and seek refuge. She is a naturalized United States citizen and holds a bachelor-of-arts degree in education with a concentration in early childhood development and education. She was employed for a time by the Board of Education as a teacher before taking a position as a child care provider. As a child care provider, she was employed privately by the Ayala family at the time described in this complaint.

### Background

15.     On or about July 2013, MS. CASTILLO was employed by Maria Ayala and Kenneth Ayala (an NYPD Detective) as a caretaker and babysitter for their two young children. While employed by them, she worked four (4) days a week, from 7:30 a.m. to 6:30 pm for approximately one (1) year.

16.     When MS. CASTILLO was initially hired, Detective Ayala sternly cautioned her about the repurcussions of stealing from him.  He reminded her that he was a member of the NYPD, that he had "friends" at the local precinct, and he could have her "locked up" if he made a phone call to his "friends."  Detective Ayala cautioned that he would not stand for anyone stealing from his home.  MS. CASTILLO advised Detective Ayala and Mrs. Ayala that nothing was worth losing her job or her reputation.  She

explained that in her profession, if branded a thief, she would no longer be able to secure employment in private homes.

17.    Several months later, on July 27, 2014, the Ayala's walked into the 68th Precinct to file a complaint against MS. CASTILLO for stealing property on January 5, 2014.

18.    Despite, the property being stolen in January and the filing of the complaint in July, the Ayala's abruptly terminated MS. CASTILLO's employment on August 8, 2014. MS. CASTILLO was dismayed and saddened when the Ayala's terminated her employment. They offered no other explanation other than things in their apartment went missing.


## The Arrest

19.    On August 14, 2014, at approximately 4:30 pm, MS. CASTILLO heard the bell to her apartment and instinctively buzzed in the caller.  While opening her front door, she was confronted by two men who identified themselves as New York City detectives, one of them being DET. DIFORTE and the other DET. MARC LEONARD. MS. CASTILLO believes these two detectives are friends of Detective Ayala.

 She was shocked by the presence of the detectives at her apartment door. The two detectives stood blocking her apartment door way. She asked the detectives what is this all about; they refused to answer her question, only insisting that she knew why they were there.  Defendants, without explanation or lawful authority, immediately ordered her in a harsh tone of voice to accompany them to the 68th precinct.  She complied in fear with their order and turned to enter her bedroom to get her shoes. Without her

consent, both detectives walked into her apartment behind her as she went to her bedroom to retrieve her shoes. One detective stood by her bedroom doorway observing her as  she put her shoes on.

20.     MS. CASTILLO left her apartment with the detectives not knowing why they ordered her to leave with them to the police precinct for an explanation.  She was too afraid to refuse their order.  When they arrived at the 68th precinct, one detective walked directly in front of her while the other detective walked closely behind, she believed it was done to prevent her from escaping.  Although MS. CASTILLO was not handcuffed, she was not free to leave and she strongly believed that she was not free to leave even if she wanted to.

21.     She was led into a small 12 by 12 foot, dirty interrogation room with a small table and bench. What ensued was a lengthy interrogation conducted by DET. DIFORTE and DET. LEONARD. MS. CASTILLO was brandished a common criminal. The detectives never suggested that MS. CASTILLO could leave the interrogation room if she wished.   She reasonably believed that she was obligated to answer their accusatory questions if she was to know the reason for being brought to the precinct.

22.     One of the detectives read aloud to MS. CASTILLO each and every Miranda warning. He then asked her if she understood each particular Miranda warning that was read. After which she was ordered to initial each question and also sign the form. She complied by initialing each question and signing on the designated signature line.

23.     The detectives then proceeded to interrogate her in a hostile, aggressive manner and accused her of theft at the Ayalas' apartment. MS. CASTILLO responded to each and every question posed by the detectives truthfully and to the best of her ability in a polite and calm manner.   She informed defendants of the same facts she previously reported to the Ayalas.

24.     Defendants explained that they were told by Detective Ayala that MS. CASTILLO was a thief.  MS. CASTILLO was astonished that the Ayala's would accuse her of stealing and felt intimidated by the detectives' accusatory questions.   The detectives, continuing with MS. CASTILLO's interrogation, reassured her that they knew she had the stolen items and all they wanted was to return those items -- jewelry and an NYPD parking placard -- returned to the Ayalas.   MS. CASTILLO adamantly denied stealing the items.

25.     The detectives then further accused her of transferring the alleged stolen property to a third party. It then became clear to  MS. CASTILLO why she was being detained.  MS. CASTILLO accused the detectives of colluding with Detective Kenneth Ayala, their friend, to hold her against her will and intimidate her.  They did not respond to her accusation and proceeded to process her arrest, subsequently informing MS. CASTILLO that she was being charged criminally with grand larceny because she did not cooperate with them. The detectives then proceeded either probable cause or proper investigation.

26.     MS. CASTILLO was placed under arrest after a three (3) hour interrogation. The detectives proceeded to handcuff and book MS. CASTILLO on various theft charges.   She felt numb with disbelief and powerless since all she could do

was to comply with the orders given by the arresting detective.  She remained in shock as to what was transpiring before her. MS. CASTILLO had never been arrested before. She was always a good law-abiding citizen and she thought, "How, could this happen to me?  How long would I be detained; how might I have avoided being detained, arrested, or handcuffed?"

27.    The detective then proceeded to fingerprint and process the arrest of MS. CASTILLO. She was once again handcuffed and then transferred to central booking at the Brooklyn Criminal Court for further processing of her arrest; her picture taken as well as her iris scanned. She felt horrified at being placed into a jail cell. She was placed in a jail cell with a handcuffed mentally disturbed woman that was screaming and spitting and was terrified of being assaulted by her. She was confined from the time of her arrest until her release.

28.    Defendants forcibly detained and arrested MS. CASTILLO at the behest of Detective Ayala.  Their actions were not in response to a complaint made by the Ayalas, but instead intimidated and tormented MS. CASTILLO as a favor to their fellow officer. MS. CASTILLO was never brought before a judge to be arraigned. It was only after a police officer came over to her jail cell and yelled out her name and informed her that she was being released. Upon information and belief, the Kings County District Attorney's office declined to prosecute MS. CASTILLO for want of a complaining witness.  All the criminal charges were dropped when the defendant detectives could not demonstrate probable cause.

29.    On August 15, 2014 at 3:30 pm, MS. CASTILLO, after suffering such a harrowing traumatic experience, was finally released.  Her nightmare finally came to an

end when she was free to leave. She had spent twenty-three (23) stressful hours in police custody. She met her family outside the courthouse who were also distraught yet relieved.

30.    Even though MS. CASTILLO was not physically injured while she was held in police custody yet, she was horrified and humiliated by the arrest, confinement, accusatory interrogation by the detectives resulting in her suffering emotionally and psychologically. As a consequence of this arrest, she suffered severe depression and anxiety.

31.    In addition to her mental anguish, she lost an employment opportunity working as a teacher's assistant in a school for autistic children due the arrest appearing on her previously clean record. Despite the criminal case never reaching arraignments and dropped by the District Attorney's office, her arrest, however, was never erased from the criminal justice computers. After being hired MS. CASTILLO was denied the position because of the arrest. As a result of this major oversight by the NYPD, the Board of Education discovered, during the vetting process, that she had been arrested on grand larceny charges. She now felt that this black mark on her record, would make it next to impossible for her to find employment. After losing this job opportunity with the Board of Education and being unemployed, she did not want to go on living.  The collateral effects of the arrest culminated with two suicide attempts by MS. CASTILLO.  MS. CASTILLO was regularly seeing a therapist.  MS. CASTILLO's arrest and detention by the detectives  was without probable cause and her subsequent aforementioned injuries were the proximate cause of this arrest.

## CAUSES OF ACTION

## COUNT ONE FOR RELIEF

## 42 U.S.C. § 1981, 1983 AND THE FOURTH AMENDMENT VIOLATIONS FOR FALSE ARREST

32.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "31" of the complaint as if fully set forth herein.

33.     On or about August 14, 2014, in the County of Kings, New York, OLGA CASTILLO was unlawfully detained, arrested, imprisoned by agents, servants and/or employees of defendant, CITY including DET. DIFORTE, and DET. LEONARD.

34.     That the aforesaid and imprisonment was malicious, unlawful, and not based upon a warrant, probable cause, and or any other justification, and was therefore a false arrest and imprisonment.

35.     That defendant CITY, through its agents, servant and/or employees, including police defendants, DET. DIFORTE, and DET. LEONARD acted in bad faith and without probable cause in committing the aforesaid arrest and imprisonment of OLGA CASTILLO.

36.     At the time of her unlawful arrest and imprisonment, OLGA CASTILLO had not committed or attempted to commit any illegal act.

37.     At the time of OLGA CASTILLO's unlawful arrest and imprisonment, the defendants knew or should have known, through the exercise of proper procedure and reasonable investigation, that the aforementioned arrest and imprisonment were false and without probable cause.

38.     That the aforesaid arrest and imprisonment was made at the behest of Detective Ayala seeking only to intimidate MS. CASTILLO.

39.     The aforesaid false arrest and imprisonment caused OLGA CASTILLO to suffer severe emotional and psychological distress, anguish, anxiety, fear, and humiliation, loss of freedom, loss of wages, legal expenses, and damage to her reputation.

40.     By reason of the foregoing, the defendants became liable to OLGA CASTILLO in a sum of money which exceeds the jurisdiction limits of all court of lesser jurisdiction.


**COUNT TWO FOR RELIEF**

**MUNICIPAL LIABLILITY FOR CONSTITUTIONAL VIOLATIONS**
**MONELL CLAIM AGAINST THE CITY OF NEW YORK – 42 U.S.C.§ 1983**


41.     Plaintiff repeats  and reiterates the allegations contained in paragraphs "1" through "40" of the complaint as if fully set forth herein.

42.     The City of New York directly caused the constitutional violations suffered by the Plaintiff and is liable for the damages suffered by the Plaintiff as a result of the conduct of the Defendants. The conduct of the Defendants was a direct consequence of the policies and practices of the defendant, City of New York.

43.     The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and NYPD, all under the supervision of ranking officers of the NYPD.

44.     The aforementioned customs, practices, procedures and rules of the City and NYPD include, but are not limited to: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

45.     At the time of the aforementioned constitutional violations, the City and NYPD were and had been on notice of such unconstitutional conduct, customs, and de facto policies, such that the failure of the City and NYPD to take appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part *infra*, the need for more effective supervision and other remedial measures was patently obvious, but the City and NYPD made no meaningful attempt to prevent future constitutional violations.

46.     The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented by the following civil rights actions and parallel prosecutions of police officers:

a.  Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y)(police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing these practices and customs);

b.  Long v. City of New York, 09-CV-6099 (AJK) (S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.)(officer swears out a false complaint and is convicted of falsifying police records);

c.Taylor-Mickens v. City of New York, 09-CV-7923 (RWS) (S.D.N.Y) (police officers at 24th precinct issue four summonses to a woman in  retaliation for her lodging a complaint  with the Civilian complaint  review Board against the precinct);

d.Lin v. City of New York, 10-CV-1936 (PGG) (S.D.N.Y) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

e.  Colon v. City of New York, 9-CV-0008 (JBW)(E.D.N.Y) (in an Order dated   November 29, 2009 denying the City's motion to dismiss on Iqbal/Twombley grounds, wherein the police officers at issued were and prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote:

> 'Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the       New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration— through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.'

f.  People v. Arbeedy, 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics detective found guilty planting drugs on two innocent civilians; former undercover NYPD narcotics  officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stating: "It was

something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach  bodies  to  it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it – being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h.   <u>Williams  v.  City  of  New  York</u>,  06-CV-6601  (NGG) (E.D.N.Y.)(officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on premises);

i.   <u>MacNamara  v.  City  of  New  York</u>,  04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of   perjured sworn statements systematically provided by officers to attempt to cover up or  justify unlawful mass arrests of approximately 1800 people has been and continues to      be developed in the consolidated litigation arising out of the 2004 Republican National  Convention);

j.   <u>McMillan  v.  City  of  New  York</u>,  04-cv-3990  (FB)(RML) (E.D.N.Y.)(officers fabricated evidence against an African- American man in Kings County and initiated drug charges against him, despite an absence of an quantum of suspicion);

k. <u>Avent  v.  City  of  New  York</u>,  04-CV-2451  (CBA)  (CL) (E.D.N.Y.)(same);

l. <u>Smith v. City of New York</u>, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m.  <u>Powers  v.  City  of  New  York</u>,  04-CV-2246  (NGG)  (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD);

n.  <u>Nonneman  v.  City  of  New  York</u>,  04-CV-10131  (JSR)(AJP) (S.D.N.Y.)(former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's

suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youths);

o. <u>Richardson v. City of New York</u>, 02-CV-3651 (JG)(CLP) (E.D.N.Y.)(officers fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p. <u>Barry v. City of New York</u>, 01-CV-10627 (CBM) (S.D.N.Y.)(triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged the NYPD had an "unwritten but persuasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

q. <u>White-Ruiz v. City of New York</u>, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y., 1997)(holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

r. <u>Ariza v. City of New York</u>, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis 20250 at 14(E.D.N.Y.)(police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of policy to regulate against police officers who exposed police misconduct and a failure to train in the police department).

47.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence, are further evidenced, inter alia, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors. Corrupt and honest officers told

us that their supervisors knew or should have known about falsified versions  of searches and arrests and never questioned them.[1].{…}

What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world. Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get the suspected criminal off the streets. This is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[2]

b. In June 2011, in the case in New York County Supreme Court entitled People v. William Eiserman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ting] to faking a marijuana case against one man and cocaine-related charges against another – and training Velasquez [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[3]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two      other officers had made the arrest and handed the arrest off to Corniel. The suspect was released. [4]Moreover, Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

---

[1] Mollen Commision report, p.36

[2] Mollen Commission Report, pp 40–41.

[3] Melissa Grace, *NYPD Sgt. William Eiseman Pleads Guilty to Lying Under Oath in Plea Deal*, Daily News, June 27, 2011, available at http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288

[4]Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009 available at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJVogv4Ndeqcl.

That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filing arrest and incident reports.[5]

d. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th precinct of the NYPD, which used to be under Mr. Kim's command, is also under investigation by the United States Attorney's Office for "planting drugs on suspects and stealing cash during gambling raids." The 109 th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest. According to the Assistant United States Attorney Monica Evans, members of the 109 th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[6]

e. In December 2009, two officers from the 81 st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from Internal Affairs Bureau. As explained in the New York Post:

The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct. Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes. [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30 cuffed him, but they claimed that they had seen him selling the bogus butts to two people, according to sources. Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

To complete ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting…

---

[5] Id.
[6] John Marzulli, *Claims of Corruption in Queens Precinct Put precinct Crooked Cop's Sentencing on Hold*, N.Y. Daily News, June 20, 2008, available at http://www.nydailynews.com/news/crime/claims-corruption-queens-precinct-put-crooked-sentencing-hold-article-1.296352.

[P]olice sources said [this action] stem[s] from Precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[7]

f. In early 2010, the City settled a civil rights lawsuit wherein one Officer Sean Spencer falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the woman $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[8]

48.     Furthermore, the existence of the aforesaid unconstitutional customs and policies, specifically with regard to "productivity goals," may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[9]

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "'The bottom line is everybody's individual activity is being looked at." Later in the recording made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin

---

[7] Id.
[8] John Marzulli, *Brooklyn cops charged with barging into sting operation, arresting a fellow officer* ,N.Y. Daily NewsJ uly 30,2010,available at http://www.nydailynews.com/new-york/brooklyn-cops-charged-barging-sting-operation-arresting-fellow-officer-bogus-charges-article-1.204251
[9] Jim Hoffer NYPD Officer claims pressure to make arrests WABC TV Eyewitness News, March 2, 2010, available at http://abc13.com/archive/7307336/ ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[10]

c. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss; to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at   Pizza Hut, this  is what you're going to be doing till (sic) then."[11]

d. The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct.  The memos specifically instructed officers about the "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" that they were expected to issue.  The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[12]

e. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[13]

f. In December of 2010 and in response to the pressure from their supervisors to issue baseless summonses pursuant to the policy and practice of quotas, police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[14]

---

[10] Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts but brass says there's no quotas,* N.Y. Daily News, March 3, 2011.

[11] Id.

[12] James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010.

[13] Tom Namako and Kirsten Fleming, *Nightime Riders in Big Sit Fit,* The New York Post. December 26, 2009, available at http://nypost.com/2009/12/26/nighttime-riders-in-big-sit-fit/.

[14] Rocco Parascandola, *Irate cops at the 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas,* N.Y. Daily News, Dec. 12, 2010, available at http://www.nydailynews.com/news/crime/irate-cops-79th-precinct-bedford-stuyvesant-threaten-boycott-quotas-article-1.474648.

g. In response to the planned summons-boycott at the 79th Precinct on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[15]

h. Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[16] Ultimately, the jury in that case judged that the police and a policy "regarding the number of arrests officers were to make that violated plaintiffs constitutional rights and contributed to her arrest."[17]

i. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violation citations; three "quality-of-life" summonses, make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.19[18]

j. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News: The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said. 'You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The

---

[15] Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79'th Precinct who want to go on summons strike* , N.Y. Daily News, Dec. 15,2010, available at http://www.nydailynews.com/new-york/deputy-chief-michael-marino-threatens-cops-79th-precinct-summons-strike-article-1.472513
[16] William J. Gorta, *Brooklyn Mom's Suit. Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15,.2011, at 6, available on  Westlaw at 2011 WLNR 2986205; see also Oren Yaniv,
*Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. I5, 2011, at 20, also available on Westlaw at 20 WLNR 2986205.
[17] Oren Yaniv, *Court rules that cops do use quotas; woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News. Feb. 19, 2011; available at http://www.nydailynews.com/news/crime/court-rules-cops-quotas-woman-injured-2006-arrest-settles-75-000-article-1.134856
[18] *New York City Ticket Quota Confirmed, Denied,* The Newspaper.Com, January 21, 2006, available at http://thenewspaper.com/rlc/news.asp?ID=914; *see also,* Kirsten Cole. *NYPD's Bogus Little Secret: Parking ticket Quotas- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at*
 http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html.

News. Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

Creighton then told the cops to finagle the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint states. Unbeknownst to Creighton, one officer had his NYPD radio switched on so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by the 911 dispatcher.[19]

49.     The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact are further evidenced, inter alia, by the following:

a. With respect to Fourth Amendment violations, in <u>Ligon v. City of New York</u>, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that plaintiffs challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[20] Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

b. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states: In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted - especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority - which is exactly

---

[19] Allison Gendar *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, available at http://www.nydailynews.com/news/crime/nypd-captain-allegedly-caught-arrest-quota-fixing-article-1.256006.
[20] Id. at *34.

what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[21]

c. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

d. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread... custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[22]

e. In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra – they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This shows, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement, and/or encouragement of unconstitutional policies, customs, and practices.[23]

f. Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[24] When it does, however, Commissioner Kelly

---

[21] Mollen Commission Report, pp. 2-3, available at pp. 2-3, available at
http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commissiono/%20-%20NYPD.pdf.
[22] Loren Yaniv and John Marzuli, *Kelly Shrugs Off Judge Who Slammed Cops*
, New York Daily News, December 2, 2009, available at http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.
[23] Rocco Parascandola et al, *Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and his Team Have Cost the City More Than $1.5 Million in Settlements* , N.Y. Daily News, May 19, 2013, available at http://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbarra-team-finest-article-1.1348075.
[24] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated the CCRB substantiated only (about 5%). See, CCRB Jan.-Dec. 2007 status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of

controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[25] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[26]

50.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, are further evidenced, *inter alia*, by the following:

a. In a suit filed in 2012, Officer Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders about the pressure that the NYPD's illegal quota system placed on officers.[27]

b. In Griffin v. City of New York, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his

---

substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories inter alia sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrate by themselves or fellow officers, supervisors and/or subordinates.

[25] Christine Hauser, *Few Results for Reports of Police Misconduct* , New York Times, October 5, 2009 at A19.

[26] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[27] Al Baker, *Bronx Police Precinct Accused of Using Quota System* , N.Y. Times, Feb. 24, 2012, available at        http://www.nytimes.com/2012/02/24/nyregion/lawsuit-says-bronx-police-precinct-uses-quota-system.html?_r=0.

locker and faced other repercussions from fellow police officers that his supervisors failed to address.[28]

c. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

d. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

e. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

51.     The existence of the above-described de facto unlawful policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including without limitation, Commissioner Bratton.

52.     The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Bratton who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public

---

[28] Id at 389-92. See also Joseph Goldstein, Officers, Exhorted to Report Corruption, Still Fear Retaliation, N.Y. Times, June 25, 2012, available at http://www.nytimes.com/2012/06/25/nyregion/new-york-police-officers-face-retaliation-for-reporting-corruption.html?partner=rss&emc=rss&pagewanted=all.

statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testifying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

53.     All of the foregoing acts by defendants deprived Plaintiff of her federally protected rights, including, but limited to, the constitutional rights enumerated herein.

54.     Defendant CITY knew or should have known that the acts alleged herein would deprive Plaintiff of her rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

55.     Defendant CITY is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

56.     Despite knowledge of such unlawful de facto policies, practices, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including Commissioner Bratton, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement

of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

57.     The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest OLGA CASTILLO without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiff's constitutional rights. Pursuant to the aforementioned City policies, practices and/or customs, the officers failed to intervene in or report Defendants' violations of Plaintiff's rights.

58.     Plaintiff's injuries were a direct and proximate result of the defendant, CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant, CITY and the NYPD to properly supervise, train and discipline their police officers.

59.     As a result of the foregoing, Plaintiff was deprived of her liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

## **PRAYER FOR RELIEF**

Plaintiff requests the following relief jointly and severally as against all of the Defendants:

a.     Award Plaintiff compensatory damages in the amount to be
       determined by a jury;

27

b.      Award Plaintiff damages in the amount to be determined by a jury;

c.      Award costs and interest and Attorney's fees pursuant to 42 U.S.C. § 1988;

d.      Award cost of suit pursuant to 42 U.S.C. § 1920 and 1988; and

e.      The convening and paneling of a jury to consider the merits of the claims herein; and

f.      Award such other and further relief as this Court may deem appropriate and equitable as may be required in the interest of justice.

Dated: Bronx, New York
       February 21, 2018

Respectfully submitted:
*Law Office of Lauriano Guzman, Jr., P.C.*


*/s/ Lauriano Guzman, Jr.*

By: LAURIANO GUZMAN, JR. (3330)
*Attorney for Plaintiff,*
*Olga Castillo*
2565 Frisby Avenue
Bronx, New York  10461
T:  (718) 892-8200
F:  (718) 892-8203
E:  guzmanesq@aol.com